Filed 7/2/15  In re M.N. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re M.N. et al., Persons Coming Under the Juvenile Court Law. | |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>            Plaintiff and Respondent,<br><br>      v.<br><br>M.N.,<br><br>            Defendant and Appellant. | C077065<br><br>(Super. Ct. Nos. JD234690, JD234691) |

The juvenile court removed minors M.N. (one year four months old) and S.N. (four months old) from their parents' physical custody.  Father contends the dispositional orders removing the children from his care require reversal because they are not supported by substantial evidence and the juvenile court did not consider an alternative

order mandating mother to leave the family home.[1]  We conclude the orders removing the children are supported by substantial evidence and any error in not considering alternative dispositions was harmless.  Therefore, we affirm the dispositional orders.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2014, mother was treated at the emergency room after father found her convulsing following her consumption of approximately 20 acetaminophen pills.  This incident precipitated a home inspection by the Sacramento County Department of Health and Human Services (the Department) because the children were in mother's care when she consumed the excessive number of pills.  The home inspection revealed empty beer bottles and a marijuana smoking device within M.N.'s reach in the parents' bedroom, piles of dirty clothes in the living room and the parents' bedroom, empty prescription bottles in the bedroom and on the kitchen counter, and insufficient diapers and food.  Additionally, both children were asleep with very wet diapers and smelled as if they had not been bathed recently.  Father denied mother had attempted suicide, she was abusing prescription medication, and either parent was drinking heavily or consuming marijuana in the home.  Father agreed to temporarily place the children with a relative as part of a safety plan, but he later stated an intention to remove the children contrary to the safety plan so they could be home for Mother's Day.[2]  Father also failed to report for a drug test as he had agreed.

---

[1]  Mother also appealed the jurisdictional and dispositional orders, but we dismissed her appeal pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835.

[2]  These relatives later indicated they would be unable to serve as an ongoing placement for the children.  By the time of the contested jurisdictional and dispositional hearing, the children were in foster care.

The Department filed petitions alleging the children came within the jurisdiction of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivision (b),[3] because they were at substantial risk of harm due to the parents' failure or inability to supervise or protect the children adequately, the willful or negligent failure of the parents to provide adequate food, clothing, shelter, or medical treatment, and the inability of the parents to provide regular care for the children due to the parents' mental illness, developmental disability, or substance abuse. The juvenile court sustained the jurisdictional petition on the basis of mother's untreated mental illness. Father does not contest the jurisdictional finding.

### *Disposition Report*

During subsequent communications between the Department and the parents, mother and father resisted the Department's efforts to investigate and to provide services. Mother acknowledged the family had been the subject of child welfare investigations in Kansas, Virginia, and Placer County, she had declined and resisted mental health services offered to her in all three jurisdictions, and the family had left each jurisdiction while investigations were ongoing without providing contact information. Father refused to participate in an alcohol or drug assessment, but agreed to complete drug testing. Father admitted there were investigations in Kansas and Virginia, they had declined services in both instances, and he and mother had removed the children from a relative in Kansas, contrary to a voluntary safety plan. Father denied needing services, believed he is an adequate parent, and stated he would only participate in services if ordered by the court.

Father denied mother had any mental health issues and stated she had taken the acetaminophen pills for an undiagnosed migraine. Father acknowledged mother had

---

[3] Undesignated statutory references are to the Welfare and Institutions Code.

declined mental health services in Virginia and Kansas, but said it was because she does not believe she had any mental health issues. Father too does not believe mother has any mental health issues. Father also denied mother had ever threatened suicide, and he believes mother's consumption of an excessive amount of acetaminophen was a "one time incident." After the children were detained, the following letter, handwritten by mother, was found in the children's diaper bag: "To whomever reads this, I am miserable. Constantly in poverty and turmoil. I'm starving to death. I only eat maybe once a day. My children are well taken care of. However, I am not. I have nothing else to live for. My husband hates me. My family isn't around, I'm broke, and could have an incurable disease that forever will be mine. I just want the pain to end. Goodbye to all who still care."

In the Kansas investigation, it was noted the family was living with the paternal grandparents in an unsanitary home, the paternal grandparents have a history with Child Protective Services (CPS), and would not allow the social worker into the home to investigate. There was also a report of domestic violence, and it was noted the parents had moved out of the paternal grandparents' home and were living with friends. Mother and father agreed to place M.N. with the maternal great-grandmother while they determined their next step. Three days later, the parents removed M.N. in contravention of the safety plan, and then left the state and changed their phone numbers without contacting CPS. According to the Kansas social worker, the parents "lie a lot."

In the Virginia investigation, it was revealed the parents left Kansas with someone they had met online who falsely promised them a place to stay in Virginia. The parents were staying at a homeless shelter, but were kicked out and began living in an ambulance they had purchased. There were concerns about M.N.'s lack of medical attention and her developmental delays. The parents were referred to programs for a car seat and medical

care, but they did not follow through and also did not apply for Medicaid or food stamps. The parents also declined a mental health assessment for mother. Father told CPS staff that "no one was going to tell them how to raise their daughter." Again, the family left the state during the investigation without contacting the social worker.

In Placer County, a public health nurse noted M.N. had motor delays and referred her for services, and she helped mother contact county mental health services. The nurse also noted a "disconnect" between the parents, they talk badly about one another, and the relationship appeared to be getting worse. After the parents moved to Sacramento County, the nurse asked for their new address to mail them something, but mother declined to provide it. A Placer County social worker spoke with father to obtain their new address as the investigation was ongoing, but father refused to provide it because he did not believe CPS should be involved.

The paternal great-grandfather expressed concerns about both parents' mental health and their ability to care for the children. Father had been diagnosed with attention deficit hyperactivity disorder (ADHD) when he was seven years old. In addition to ADHD, the paternal grandfather noted father had been diagnosed with Asperger's syndrome when he was 14 years old. Though both parents cared about the children, the paternal great-grandfather noted the parents forget day-to-day things as a result of their mental health issues, which results in neglect of the children. According to him, they would forget to feed or bathe the children, and the children would be left without supervision or interaction. He believes both parents would benefit from mental health assessments and therapy. He also stated father lies a lot, and he only believes 30 to 40 percent of what father says. Father reported it was the paternal grandfather who was diagnosed with Asperger's syndrome. Father also stated he holds a bachelor of science degree in engineering (though the paternal great-grandfather expressly denied

that claim). Father initially indicated he received cash aide and food stamps, but later conceded he received no income or support. Father also acknowledged he had been diagnosed with ADHD and had been prescribed medications, but stated he did not take the medications because they " 'zombiefied' " him.

Both parents visited with the children fairly regularly, and appeared to engage appropriately with the children for the most part. However, the parents did miss visits when they felt unwell and when they lacked transportation; they arrived late for other visits, and they had to reschedule one visit. During all visits, father engaged primarily with M.N. and mother with S.N., and it appeared father was not as comfortable providing care for S.N. During a two-hour visit, father seemed tired, was interacting with M.N. while lying on the couch, and dozed on the couch. At the end of that visit, father reluctantly agreed to sign M.N. up for services, but refused to sign the release of information because he "did not want any information given to CPS."

The disposition report recommended the children remain in their confidential foster care placements because the parents had declined to participate in services in Virginia, Kansas, and now in both Placer and Sacramento Counties. Also, it appeared the children were not thriving in their parents' care, as evidenced by the tremendous improvements M.N. had made since she was removed from their care. Additionally, relatives express concerns about the impact of the parents' unaddressed mental health issues on the children's well-being.

### *Addendum Reports*

In a subsequent addendum, additional information from the Virginia and Kansas investigations was detailed. The Virginia investigator expressed a concern that father has mental health issues, the parents were seen arguing while holding then-infant M.N., and mother had not been feeding M.N. because they did not have enough food. The Kansas

social worker indicated the parents were resistant to working with them and father was "very controlling." She also had concerns about both parents' mental health.

In a further addendum, it was noted that while dependency proceedings were ongoing, mother was again admitted to the emergency room for a Tylenol overdose with toxicity. Mother had again indicated it was accidental, and she had taken the pills to treat her migraine headache. Mother also presented with bruises on her arm, which she indicated were the result of a domestic violence incident with father. As of a July 16, 2014, meeting with a social worker, neither parent had begun parenting education and both parents were referred to mental health services. At that time, mother reported she was diagnosed with bipolar disorder and was directed to obtain continued services.

### Juvenile Court's Disposition Orders

The juvenile court found evidence mother has serious mental health issues that are putting the children at substantial risk of serious physical harm. It noted the children are very young, and not in a position to care for or defend themselves. Additionally, mother has attempted suicide on two occasions: once while she was the sole parent caring for the children, she left a suicide note in the children's diaper bag; she attempted suicide again after the children had been detained, all of which indicate a risk of harm to the children if placed back in her care. After the second attempt, mother was diagnosed as bipolar. Also, the presence of empty liquor bottles and prescription pill bottles in the home indicates mother was likely abusing those substances in an effort to self-medicate. Mother has repeatedly declined services to help her address her mental health issues.

As to father, the juvenile court found he "basically is enabling the mother. He believes that she doesn't have any mental health problems, she is just fine, and she doesn't need treatment. The moves from state to state every time CPS or the state equivalent of CPS got involved . . . can be viewed as nothing more than an effort to avoid

losing their children, but also -- but unfortunately an effort to avoid treating the problem that causes such great risk to the children. Denial of the mother's problem, going to the extent of moving from state to state to state" caused the juvenile court to conclude "there is clear and convincing evidence of substantial risk to the children from both parents, given the father's support, denial, enabling of the mother's denial of mental health issues and ultimately her efforts to end her life. These children, again, given their young age, are at great risk by such behavior." Therefore, the juvenile court removed the children from the parents and offered both parents reunification services.

## DISCUSSION

Father contends the removal orders must be reversed because there is insufficient evidence to support removal of the children from his physical custody because there is no jurisdictional finding against him, and the juvenile court failed to consider mandating mother's removal from the family home as an alternative dispositional order. We disagree. Despite the jurisdictional finding being based on mother's mental illness, there is substantial evidence that returning the children to father's custody would pose a substantial risk of physical harm, and there is no reasonable probability the juvenile court would have placed the children in father's custody even if mother were ordered removed from the home.

### A.

### *Standard for Removal*

A child shall not be taken from his or her parents' physical custody absent a showing by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the

minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)  In lieu of removal, the court must consider, "as a reasonable means to protect the minor," the removal of the offending parent from the home, and allowing the nonoffending parent to retain physical custody if he or she presents an acceptable plan to protect the child from future harm. (§ 361, subd. (c)(1)(A)-(B).)  The court must also "make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (d).)

## B.

### *Substantial Evidence Supports Removal*

Father contends there is no evidence, other than mother's mental health problems, to support the order removing the children from his physical custody.  Father claims his denial and enabling of mother's mental health problems cannot, *without more*, constitute substantial evidence of a risk of future harm sufficient to warrant removal of the children from his custody.  However, as evidenced below, there was *more*.  There was substantial evidence to support the juvenile court's dispositional order removing the children from both mother and father's physical custody based not only on his denial of mother's mental health problems, but also on father's resistance to services, his pattern of leaving jurisdictions while child welfare investigations were ongoing, and concerns about his ability to care for the children.

"A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent.  [Citation.]  The parent need not be dangerous and the minor need not have been harmed before removal is appropriate.  [Citation.]  The focus of the statute is on averting harm to the child.  [Citation.]" (*In re T.W.* (2013) 214 Cal.App.4th

1154, 1163.) We review such an order for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "Under this standard '[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)

"[H]arm may not be presumed from the mere fact of mental illness of a parent" (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318) but "denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision." (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.) Additionally, while "past conduct may be probative of current conditions," it alone is insufficient if there is no reason to believe the alleged conduct will reoccur (*In re James R.* (2009) 176 Cal.App.4th 129, 135-136), but the court "may consider a parent's past conduct as well as present circumstances." (*In re N.M.* (2011) 197 Cal.App.4th 159, 170.)

Here, mother continued to live with father, and she had again attempted suicide during the course of the dependency proceedings. Nevertheless, father repeatedly denied mother had attempted suicide, denied mother had any mental health issues or abused medications, and denied he had any mental health problems. Father and mother had repeatedly refused services offered to them in prior cases and in the current case, and father was resistant to any CPS involvement. The parents repeatedly missed visits with the children because they lacked transportation, did not timely cancel visits, and did not follow up to get the bus passes offered to them. When the home visit occurred, the infant children were in father's care and custody. Yet, the children were asleep in heavily soiled diapers without sufficient clean diapers or food and smelled as if they had not been bathed recently. There were empty pill and alcohol bottles in the kitchen and the parent's

bedroom.  Family members indicated the children were neglected because both mother and father have mental health issues that prevent them from remembering to feed, bathe, interact with, or supervise the children, who were four months and just over a year old. There was no family support available, and there were financial concerns about how the parents would continue to maintain their residence and survive.  Additionally, there was a report of a domestic violence incident with father that left bruises on mother's arms. There were concerns in prior cases that M.N. had been transported in a vehicle without proper restraints, her car seat was inadequate, and she had developmental delays.  In each of these cases (Kansas, Virginia, and Placer County), father declined services offered to remedy the problems.  Further, father had a history (in Kansas, Virginia, and Placer County) of moving out of the jurisdiction with the children while a child welfare investigation was ongoing and without providing any contact information.  Thus, there was substantial evidence the children could not safely remain in father's custody.

## C.

### *Any Error In Not Considering Alternatives to Removal Is Harmless*

Father contends that because neither the Department nor the juvenile court considered alternatives to the removal of the children, the dispositional orders must be reversed.  Father claims as the "nonoffending" parent,[4] he could have been permitted to retain custody while ordering mother to move from the family home.  We conclude

---

[4]     We question father's self-characterization as a "nonoffending" parent.  A "nonoffending" parent is a parent who was not involved in the conduct that caused the removal of the child under section 361.  (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1823.)  Here, though jurisdiction was found based on mother's mental health problems, the disposition of removal was not based solely on that, but on father's denial of those problems despite her suicide attempts and the repeated recognition of her mental health problems in various child welfare investigations.

any error in not considering this alternate disposition is harmless because it is not reasonably probable the juvenile court would have allowed father to retain custody of the children had it considered that alternative.

Father relies on the cases *In re Hailey T.* (2012) 212 Cal.App.4th 139 and *In re Ashly F.* (2014) 225 Cal.App.4th 803 to support his contention. Father concedes both *Hailey T.* and *Ashly F.* are factually distinguishable from the instant matter, but claims he relies on them for the rule of law stated therein: "a juvenile court's failure to consider less drastic alternatives to removal requires reversal of a removal order where there are reasonable alternatives which could have been implemented." However, in both *Hailey T.* and *Ashly F.*, there was evidence that alternatives were available. (*Hailey T.*, *supra*, 212 Cal.App.4th at pp. 142-148 [infant child injured possibly nonaccidentally, but investigation revealed parents were "good parents," there was conflicting evidence older sister may have inflicted injury accidentally, parents engaged in services, and older child (Hailey) was in regular contact with mandated reporters at school; court held juvenile court should have considered supervision or removal of parent]; *Ashly F.*, *supra*, 225 Cal.App.4th at pp. 805-810 [mother abused children, but father claimed to be unaware of abuse, children were all five years old and older, father engaged in services, mother moved out of family home, she engaged in services and expressed remorse; court held juvenile court should have considered supervision or removal of mother].)

There is no such evidence here. As shown above, father had a history of enabling mother in her denial of her mental illness and he failed to recognize it himself, he consistently refused services offered not only for mother but for himself and for the children, he failed to provide adequate food or diapers for his four-month-old and one-year-old daughters, he had a history of absconding while child welfare investigations were ongoing, and he resented any interference in how he elected to raise the children.

Unannounced visits and supervision were not a reasonable alternative because of father's penchant for failing to respond to or cooperate with CPS, and his tendency to flee while child welfare concerns were investigated. Ordering mother removed from the home was similarly not a reasonable alternative because father did not believe mother had any mental health problems, there were concerns he also had mental health issues, and, as shown above, father was not able to adequately care for the children on his own.

Further, after the juvenile court announced its dispositional findings, father requested a progress review hearing to allow the children to be returned to him based on his promise he would abide by an order prohibiting mother from being left alone with the children until the mother rehabilitates, and he offered to agree to unannounced social worker visits. The juvenile court responded that it might consider such an order later, but the evidence showed both father and mother had denied mother's mental health problem and her need for treatment. The juvenile court stated it was concerned father's extensive denial of mother's mental health problems would compromise father's ability to abide by such an order.

On this record, we cannot say it is reasonably probable the juvenile court would have elected an alternative dispositional order that left father in charge over removal of the children even if it had been discussed by the Department in its social study (Cal. Rules of Court, rule 5.690(a)(1)(B)(i)) or considered by the juvenile court (§ 361, subd. (c)(1), (d)). Therefore, we conclude any error in not considering removal of the mother from the home is harmless. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218; see also *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171 [applying harmless error standard].)

## DISPOSITION

The dispositional orders are affirmed.


                                        _____HOCH_____, J.



We concur:



_____RAYE_____, P. J.



_____DUARTE__, J.